UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

CANARX SERVICES, INC., an Ontario,      )
Canada corporation,                     )
    Plaintiff,      )
                                        )
  vs.                         )  1:07-cv-1482-LJM-JMS
                                        )
LIN TELEVISION CORPORATION, a           )
Delaware corporation, d/b/a WISH-TV, and )
KAREN HENSEL,                           )
    Defendants.     )


**ORDER ON MOTION TO DISMISS PURSUANT TO INDIANA'S ANTI-SLAPP[1]
STATUTE (IND. CODE §§ 34-7-7-1 *et seq.*)**

  Defendants, LIN Television Corporation d/b/a WISH-TV ("WISH-TV") and Karen Hensel,

(collectively the "WISH-TV Defendants"), move the Court to dismiss Plaintiff's, CanaRx Services,

Inc. ("CanaRx"), Complaint pursuant to the Indiana Anti-SLAPP Statute, Indiana Code §§ 34-7-7-1

*et seq*.   For the reasons stated herein the Court finds that the defendant's motion should be

**GRANTED**.


## I. BACKGROUND

  CanaRx is a Canadian company that sells prescription drugs globally via mail, telephone and

the internet.  Compl. at ¶ 2.  WISH-TV is a broadcast television station located in Indianapolis,

Indiana.  *Id.* at ¶ 3.  This action arises from a broadcast report aired on WISH-TV that was prepared

and  reported  by  WISH-TV  investigator,  Karen  Hensel,  entitled  "Bad  Medicine"  (the  "News

---

  [1]"SLAPP" is an acronym that stands for "strategic lawsuits against public participation."
*See Ketner v. Timothy R. Downy Ins., Inc.*, 430 F. Supp. 2d 844, 845.

Report"). *Id.* at ¶¶ 4, 8.  The News Report aired in two parts on November 1, 2007, and November 2, 2007.  *Id.* at  ¶¶ 8, 10.

       In the News Report, Hensel explained that counterfeit and illegal drugs enter the United States via internet orders and that some of these drugs end up in Indiana.  Pl.'s Ex. A; Hensel Aff. at ¶¶ 6-7.  The first part depicted Food and Drug Administration ("FDA") and Customs and Borders Protection ("CBP") officials inspecting and determining that some drugs shipped to Indiana addresses were counterfeit.   Hensel Aff. at ¶ 6.   It also included an interview with FDA Commissioner, Andrew VonEschenbach, who stated his concern that counterfeit and illegal drugs were entering the United States via internet orders.  *Id.*  In addition to elaborating on the dangers posed by purchasing prescription drugs on the internet, the second part of the News Report discussed the fact that the City of Muncie, Indiana, requires its employees and retirees to order their long term prescription drugs through mail-order services with the option of using the online services of CanaRx, which will waive the 20% co-pay for the employees.  *Id.* at ¶ 7.

## A. RESEARCH & DEVELOPMENT OF THE NEWS REPORT

       Hensel developed her report through an investigation that began in the spring of 2007 when she read a FDA press release entitled "FDA Alerts Consumers to Unsafe, Misrepresented Drugs Purchased over the Internet."  *Id.* at ¶ 9.  The FDA press release generally warned United States consumers that buying prescription drugs online is potentially dangerous and it specifically stated the dangers associated with a particular group of counterfeit drugs that contained the active ingredient halperidol which is used to treat schizophrenia.  Defs.' Ex. 1, Tab D.

Over the next few months Hensel researched the issues related to mislabeled, counterfeit and illegal drugs. Hensel Aff. at ¶¶ 10-14. She arranged interviews and facility tours at the four largest ports of entry in the United States. *Id.* at 15-16. On June 18, 2007, she conducted interviews with FDA and CBD officials at the JFK International Airport Mail Facility in New York, New York. *Id.* at ¶ 17. During Hensel's visit, one FDA official stated that 80% of prescription drugs ordered online were counterfeit and another stated that lead based paint had been used as a binding agent in some counterfeit drugs. *Id.* On August 29, 2007, Hensel conducted interviews of FDA and CBP officials and toured the O'Hare International Airport Mail Facility in Chicago, Illinois, and a FDA inspector there told her that counterfeits could be sugar pills or could contain ingredients like strychnine or ground up concrete and that concrete had been previously found in counterfeit drugs intercepted at that mail facility. *Id.* at ¶ 20. She also conducted interviews in Louisville, Kentucky, and Memphis, Tennessee. *Id.* at ¶ 18-19.

Through the course of her research Hensel discovered that the health insurance plan for employees and retirees of the City of Muncie, Indiana, allowed its subscribers the option of utilizing a Canadian web-based service, CanaRx, in connection with its prescription drug plan. *Id.* at ¶ 26. Since at least 2003, CanaRx has been under investigation by the FDA. In September 2003, the director of the FDA Office of Complaint wrote a letter to the president of CanaRx in which he stated: "[The] FDA is taking action against you and your firm because you should not be continuing to profit through illegal actions that put the health of the American public at risk." Defs.' Ex. 1, Tab C at 1; Hensel Aff. ¶ 28. In October of 2003, the president of CanaRx responded to the FDA's letter and stated that CanaRx takes "numerous steps to safeguard [its] customer's [sic] health and safety,

and what [it does] creates no risk beyond that faced by U.S. consumers conducting similar transactions domestically." Defs.' Ex. 1, Tab F at 1. The FDA replied:

> Even if the drugs that CanaRx helps to import were to possess the qualities that it ascribes to them they would still be illegal . . . [u]nlike FDA-approved drugs purchased in this country, the drugs that CanaRx markets are generally illegal when imported, and their importation circumvents measures designed to protect U.S. citizens.

Defs.' Ex. 1, Tab G at 1, 5. Further, the FDA issued a press release in 2003 warning about the risk that CanaRx poses to American consumers that generally stated, "CanaRx's practices create many potential safety risks, for example, by causing the importation of drugs that may fail to meet U.S. standards, and failing to have systems in place to assure that the drugs it provides are prescribed and distributed in accordance with applicable federal laws . . . ." Defs.' Ex. 1, Tab E at 1.

In September 2007, Hensel interviewed Muncie's Mayor, a licensed pharmacist, and the Deputy Mayor to determine why the city was encouraging online drug purchases from a foreign retailer. Hensel Aff. at ¶ 35. The mayor told Hensel that he did not perceive any risk from ordering prescription drugs from CanaRx. *Id.*; Pl.'s Ex. A at 8-9. The same day as the interview, Hensel asked the deputy mayor to help her find a time to speak with a CanaRx representative. The deputy mayor responded three days later by an e-mail in which she stated that a representative of CanaRx agreed to an interview and that the deputy mayor would set a date for it the next time someone from the company visited the city. Defs.' Ex. 1, Tab H at 1. However, the deputy mayor never provided Hensel with a time to meet with a CanaRx representative. Hensel Aff. at ¶ 40.

On September 12, 2007, Hensel sought information from FDA officials regarding the current status of the investigation of CanaRx. On September 19, the FDA Office of Public Affairs told Hensel that "CanaRx is an online drug seller that we've had concerns about in the past because they

4

were selling unapproved and illegal drugs that potential[ly] pose health risks." Defs.' Ex. 1, Tab I at 1.

Further, the FDA has continued to express concerns regarding CanaRx. On February 6, 2008, FDA Deputy Commissioner for Policy sent a letter to the Mayor of Duluth, Minnesota, in which he stated "FDA has expressed concerns in the past regarding CanaRx . . . and our position regarding this company has not changed." Defs.' Ex. 1, Tab J at 3.

She had not yet had the opportunity to speak with CanaRx, so Hensel called its headquarters on November 2, 2007, at 4:03 p.m., to obtain any comments it might have concerning the second part of the News Report that was set to air seven hours later. *Id.* Hensel asked to be connected with someone who was in the office that day and would be capable of comment, and the receptionist connected her to CanaRx's President's Executive Assistant with whom Hensel left a voicemail, but Hensel never received a return call. Hensel Aff. at ¶¶ 42-43.

Hensel also interviewed the Commissioner of the FDA who expressed concern that imported drugs are dangerous because they are not subject to FDA regulation and cannot be guaranteed to meet the FDA's guidelines. Pl.'s Ex. A at 9.

At the conclusion of her research, Hensel produced a news report that exposed the risks of purchasing prescription drugs via the internet and discussed the fact that the importation of prescription drugs from outside the United States is illegal. Pl.'s Ex. A. At the time the News Report aired, Hensel believed all of the factual statements it contained to be true, and neither she nor WISH-TV entertained any serious doubts about the accuracy of the News Report. Hensel Aff. at ¶¶ 46-47.

## B. CANARX'S LAWSUIT

CanaRx alleges solely that it was defamed by the News Report.  Compl. at ¶¶ 28-32.

Specifically, CanaRx claims that the following statements form the basis of the lawsuit.

> I[-]Team 8 is there as customs officers and FDA officials open package after package
> of counterfeit drugs.  They come from China, Indiana, Canada.  All headed to the
> United States.  FDA officials say they're concerned drugs found in the packages
> could be sugar pills, could have stricnine [sic] or ground up concrete, which was
> found in some tablets.  But some cities are encouraging employees to buy their drugs
> from the internet to save money.  Muncie is one of them.  City employees and retirees
> are required to buy long term meds through mail order.  But for bigger savings,
> munciemeds.com touts Canarx.com, a canadian [sic] internet pharmacy.  I-Team 8
> took the issue to the Mayor of Muncie who is also a pharmacist.  Mayor Dan Canan
> said he's not concerned that a canadian [sic] pharmacy is recommended instead of
> stateside.  He said it's an opinion people can use if they want to.  Canarx waives the
> 20% copay as an incentive for employees[.]  The FDA said a good portion of those
> drugs, 80 % that come from the internet, are counterfeit.

> \*\*\*

> The FDA calls CanaRx: "Illegal and Dangerous"

> \*\*\*

> CanaRx did not return I-Team 8's calls for comment.

Compl. at ¶¶ 19, 21, 23.  Particularly, CanaRx alleges that the above statements were false in that:

> (a) No sugar pills, strychnine, or ground up concrete have ever been found in any
> presciption ever filled through CanaRx.

> (b) CanaRx is not a pharmacy, but is a pharmacy benefits manager, whose business
> is in the connection of consumers who seek to have prescriptions, written by
> physicians, for pharmaceuticals filled, on the one hand, with licensed and certified
> pharmacies who fill such prescriptions under the supervision of licensed pharmacists
> after verifying each prescription, using only medicines provided by identified,
> licensed, ethical drug makers in the original sealed packaging furnished by the
> manufacturer.

> (c) The statement that a "good portion" of "those drugs" furnished through CanaRx
> is "counterfeit" is false

6

(d) The [FDA] never said that "a good portion of those drugs" furnished through CanaRx, were counterfeit.

Compl. at ¶ 20.  CanaRx further alleges that the FDA never called CanaRx "illegal and dangerous" and that I-Team 8, specifically Hensel, only made one call for comment.  Compl. at ¶¶ 22, 24.

## II. GOVERNING LEGAL STANDARDS

### A. INDIANA ANTI-SLAPP ACT

Indiana's Anti-SLAPP Act (the "Act"), Ind. Code §§ 34-7-7-1 *et seq.*, provides a defense to "meritless suits aimed at silencing a plaintiff's opponents, or at least diverting their resources."  *See Hamilton v. Prewett*, 860 N.E.2d 1234, 1241-42 (Ind. Ct. App. 2007).  Anti-SLAPP statutes generally are intended to "reduce the number of lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." *Poulard v. Lauth*, 793 N.E.2d 1120, 1122 n.2 (Ind. Ct. App. 2003).  Specifically, the Act provides:

> It is a defense in a civil action against a person[2] that the act or omission complained of is: (1) an act or omission of that person in furtherance of the person's right of petition or free speech under the Constitution of the United States or the Constitution of the State of Indiana in connection with a public issue; and (2) an act or omission taken in good faith and with a reasonable basis in law and fact.

Ind. Code § 34-7-7-1.  Typically, SLAPP lawsuits are without merit and filed to force a settlement. *Kentner v. Timothy R. Downey Ins., Inc.*, 430 F. Supp. 2d 844, 845 (S.D. Ind. 2006).

Although the WISH-TV defendants filed a motion to dismiss under the Act, the statute provides that a motion to dismiss is to be treated like a motion for summary judgement.  Ind. Code § 34-7-7-9(a)(1).  Further, the statute provides that "the person who files a motion to dismiss must

---

[2]The Act defines "person" as either an individual or any other legal entity, which means that WISH-TV as well as Hensel are "persons" covered under the Act.  Ind. Code § 34-7-7-4.

state with specificity the public issue . . . that prompted the act in furtherance of the person's right of . . . free speech under the Constitution of the United States or the Constitution of the State of Indiana." Ind. Code § 34-7-7-9(b).  The Act also requires that the court base its decision on "facts contained in the pleadings and affidavits filed and discovered under the expedited proceeding."  Ind. Code § 34-7-7-9(c).

Dismissal pursuant to the Act is appropriate when ". . . the person filing the motion has proven, by a preponderance of the evidence, that the act upon which the claim is based is a lawful act in furtherance of the person's right of . . . free speech under the Constitution of the United States or the Constitution of the State of Indiana." Ind. Code § 34-7-7-9(d).  However, the "preponderance of the evidence" requirement provided in the statute is in conflict with Indiana Trial Rule 56 that states that the movant's burden on a motion for summary judgment is to make a "prima facie" showing that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law.  Indiana courts have resolved the conflict in favor of Trial Rule 56.  *See Shepard v. Schurz Commc'ns, Inc.*, 847 N.E.2d 219, 224 (Ind. Ct. App. 2006).  The corresponding federal rule to Indiana Trial Rule 56 is Rule 56 of the Federal Rules of Civil Procedure that provides the procedure for obtaining summary judgment in federal court.  *See* Fed. R. Civ. Pro. 56(e).  There is no conflict in the state rule and the Federal Rule, and thus, Rule 56 is controlling.  *See Hanna v. Plummer,* 380 U.S. 460, 465 (1965).

Substantively, the Act does not replace the Indiana common law of defamation but provides simply that the movant must establish that her speech was "lawful."  Ind. Code § 34-7-7-9(d).  *See also Shepard*, 847 N.E.2d at 224.

Finally, a prevailing defendant on a motion to dismiss under the Act is entitled to recover its reasonable attorneys' fees and costs.  Ind. Code § 34-7-7-7.  *See also Poulard v. Lauth,* 793 N.E.2d 1120, 1125 (Ind. Ct. App. 2003).

## B. SUMMARY JUDGMENT

Summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986).  *See also United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267-68 (7th Cir. 1990), *cert. denied*, 499 U.S. 923 (1991).  Motions for summary judgment are governed by Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c).  Summary judgment is the "put up or shut up" moment in a lawsuit.  *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003), *reh'g denied*.  Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986).  The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586-87 (1986); *Oliver v. Oshkosh Truck Corp*., 96

9

F.3d 992, 997 (7th Cir. 1996), *cert. denied*, 520 U.S. 1116 (1997).  It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies.  *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). When the moving party has met the standard of Rule 56, summary judgment is mandatory.  *Celotex*, 477 U.S. at 322-23; *Shields Enters., Inc. v. First Chi. Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992).

In evaluating a motion for summary judgment, a court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party.  *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996), *cert. denied*, 519 U.S. 1109 (1997).  The mere existence of a factual dispute, is not sufficient to bar summary judgment.  Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment.  *See Anderson*, 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir. 1996).  Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992).  "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party."  *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996), *cert. denied*, 519 U.S. 1115 (1997).

## C. DEFAMATION

"Defamation is that which tends to injure reputation or to diminish esteem, respect, good will, or confidence in the plaintiff, or excite derogatory feelings or opinions about the plaintiff."

*Lovings v. Thomas*, 805 N.E.2d 442, 447 (Ind. Ct. App. 2004). Under Indiana law, the elements of defamation are (1) a communication with defamatory imputation, (2) malice, (3) publication, and (4) damages. *Trail v. Boys & Girls Clubs of Nw. Ind.*, 845 N.E.2d 130, 136 (Ind. 2006). "[The] actual malice standard of proof required in defamation cases involving matters of public or general concern applies not only to public figures, but to private individuals as well." *Shepard*, 847 N.E.2d at 224-25. "Actual malice exists when the defendant publishes a defamatory statement with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 225 (internal quotations omitted). The determination of whether a communication is defamatory is a question of law for the courts initially, and the communication is "to be viewed in context and given its plain and natural meaning." *Rambo v. Cohen*, 587 N.E.2d 140, 145 (Ind. Ct. App. 1992). "Moreover, the allegedly defamatory words are to be construed in light of the circumstances of their utterance." *Id.* Truth is a defense to defamation, but the literal truth is not required. *See Hustler Magazine v. Falwell*, 485 U.S. 46 (1988); *Heeb v. Smith*, 613 N.E.2d 416, 420 (Ind. Ct. App. 1993). It is enough that the "gist" or the "sting" of the statement is true. *Heeb*, 613 N.E.2d at 421. "The test for determining whether a statement is substantially true is whether any inaccuracies caused the statement to produce a different effect on the audience than would have been produced had the literal truth been spoken." *Id.*

## III. DISCUSSION

In order for dismissal under the Act to be proper, the statement upon which the claim is based must be covered by the Act. First, for the statement to be covered under the Act, the statement must have been made by a person in furtherance of her right of free speech in connection with a public

11

issue or an issue of public interest.  Ind. Code § 34-7-7-1.  "In Indiana, the public interest is necessarily broad and cases dealing with the law of that state reveal a panoply of topics within the scope of public interest."  *Filippo v. Lee Publ'ns, Inc.*, 485 F. Supp. 2d 969, 974 (N.D. Ind. 2007).  Further, Indiana courts have held that issues of "safety and well-being are matters of public concern."  *Id.*  There is no question that the News Report was concerned with a matter of public interest.  The FDA announced the dangers of illegal and/or counterfeit prescription drugs and the risks that they pose to United States citizens and, therefore, Indiana consumers.  Specifically, the purchase and consumption of illegal and/or counterfeit prescription drugs by Indiana citizens in the City of Muncie is an issue of public health and is thus an issue of public concern.  Given the evidence before of the Court, a reasonable jury could only find that the News Report was made in furtherance of the WISH-TV Defendants' right to free speech in connection with a matter of public interest.

Second, under the Act, the statement that forms the basis of the claim must be made in good faith, and the statements in this case were.  In defamation law in Indiana, "good faith" is defined as "a state of mind indicating honesty and lawfulness of purpose; belief in one's legal right; and a belief that one's conduct is not unconscionable."  *Owens v. Schoenberger*, 681 N.E.2d 760, 764 (Ind. Ct. App. 1997).  According to the only evidence on the subject, the WISH-TV Defendants did not entertain serious doubt regarding the truth of the News Report and, in fact, believed it to be factually accurate.  Moreover, they believed that the statements and opinions expressed in it were fair and reasonable.  Further, the information that Hensel obtained in her research came from the FDA and other reliable sources.  Thus, there is no genuine question that the WISH-TV Defendants made the statements on which the claim is based with a belief that they were acting honestly and with a belief in their legal right to do so.

Finally, in order for the claim to be properly dismissed pursuant to the Anti-SLAAP Act the statements that form the basis of the claim must be lawful.  CanaRx claims that it was defamed by the above quoted statements made by the WISH-TV Defendants; the Court considers each statement in turn.

The first statement that CanaRx alleges to be defamatory is: "FDA officials say they're concerned drugs found in the packages could be sugar pills, could have stricnine [sic] or ground up concrete, which was found in some tablets."  Compl. at ¶ 19.  CanaRx claims the statement is false because "no sugar pills strychnine, or ground up concrete have ever been found in any prescription ever filled through CanaRx."  *Id.* at ¶ 20.  However, when the statement is read in the context of the News Report it is not referring particularly to drugs procured from CanaRx, and CanaRx is not even mentioned in this particular statement.  Further, it is undisputed that FDA officials have expressed concern that drugs found in packages coming into the United States could be sugar pills or have strychnine or ground up concrete in them.  Hensel Aff. at ¶ 20.  There is no question that the statement when given a plain and natural reading in its context is true, and thus is not defamatory.

Second, CanaRx alleges that Hensel stated that CanaRx was a Canadian pharmacy in the News Report and further alleges that statement was false and defamatory.  Compl. at ¶¶ 19-20.  Hensel did state that CanaRx was a Canadian pharmacy, but CanaRx alleges that it is a "pharmacy benefits manager," which simply means that a consumer who orders prescription drugs from CanaRx does not get them directly from CanaRx.  Instead, CanaRx simply coordinates the consumer's order and the later delivery of that order from a pharmacy.  Even if, for the purposes of this motion, the distinction is a relevant one, the statement that CanaRx is a Canadian pharmacy is, while not literally true, "basically" true, which is all the law requires.  Although CanaRx does not ever possess the

prescription drugs, it does deal with their sale online and it even suggests in its name that it is a pharmacy by its use of the epithet "Rx."  Therefore, assuming that referring to CanaRx as a pharmacy is an inaccuracy, it produced no different effect on the audience than if the literal truth had been spoken. Thus, the gist of the statement is true and as such is not defamatory.  *See Heeb*, 613 N.E.2d at 421.  Furthermore, the statement is not defamatory because it is not a statement that diminishes the reputation of CanaRx.  *See Lovings*, 805 N.E.2d at 447.

The third statement that CanaRx alleges to be defamatory is, "The FDA said a good portion of those drugs, 80% that come from the internet, are counterfeit."  Compl. at ¶ 19.  CanaRx claims this statement is false because it implies that the statement was referring to CanaRx specifically. When the statement is plainly read in the context of the News Report it is not referring specifically to CanaRx, and although it follows statements directly about CanaRx in the News Report, it does not refer directly or indirectly to CanaRx, instead it refers generally to drugs purchased on the internet.  Further, the statement clearly says that the "FDA said . . . ."  Thus, the question is whether the WISH-TV Defendants truthfully stated what the FDA said, not necessarily whether the FDA's statement is true.  According to Hensel, an FDA official at the JFK International Airport Mail Facility told her that 80% of prescription drugs ordered online are counterfeit.  Hensel Aff. at ¶ 17. According to the only evidence on the matter, the News Report statement is a true rendition of what the FDA said and thus, it is not defamatory.

The next statement that CanaRx alleges to be defamatory declared: "The FDA calls CanaRx: Illegal and dangerous."  Compl. at ¶ 21.  CanaRx alleges that this statement is false, but this statement is substantially true.  There is no question that the FDA stated that CanaRx's operations are illegal.  Specifically, the FDA stated that CanaRx's "operations are illegal under federal law and

14

that it continues to put American patients at risk by providing them with unapproved, illegal, and potentially risky foreign prescription drugs." Defs.' Ex. 1 at Tab E at 1. The FDA has also clearly stated the danger that it believes that CanaRx's operations pose. The FDA's warning letter to CanaRx stated that its operations presented "a significant risk to public health, and [it] mislead[s] the public about the safety of the drugs obtained through CanaRx." Defs.' Ex. 1 at Tab C at 1. CanaRx responded to the letter in another letter in which it stated that it believed its practices to be safe and legal. But the FDA responded by saying that "[e]ven if the drugs that CanaRx helps to import were to possess the qualities that it ascribes to them, they would still be illegal." Defs.' Ex. 1, Tabs F and G, p. 2. Although, the FDA did not literally call CanaRx dangerous, it did make the statement about the significant risk posed to public health by CanaRx's operations, which means substantially the same thing. As a result, the alleged defamatory statement, while not literally accurate, is nonetheless substantially true because the inaccuracy does not change the affect the statement would have had on an audience had the literal truth been spoken. *See Heeb*, 613 N.E.2d at 421.

The final statement that CanaRx alleges to be false and defamatory is "CanaRx did not return I-Team 8's calls for comment." Compl. at ¶ 23-24. CanaRx says that because Hensel only contacted CanaRx once and it was not a call that CanaRx was able to return, the implication that WISH-TV made multiple calls for comment is false. Compl. at ¶ 24. Whether this statement is true is of no consequence because the statement is not defamatory. It is not a statement that "tends to injure reputation or to diminish esteem, respect, good will, or confidence in the plaintiff, or excite derogatory feelings or opinions about the plaintiff." *Lovings*, 805 N.E.2d at 447. Whether the WISH-TV Defendants made multiple calls to CanaRx for comment is not a fact that injures

15

CanaRx's reputation or one that excites derogatory feelings or opinions about CanaRx. The allegedly false part of the statement actually has nothing to do with the actions or trade of CanaRx. Thus, because the communication is not defamatory it is not actionable regardless of its truth. *See Trail*, 845 N.E.2d at 136.

Moreover, in Indiana, the law of defamation requires actual malice on the part of the defendant, *see Trail* 845 N.E.2d at 136, and the WISH-TV Defendants did not act with malice. *See Shepard*, 847 N.E.2d at 224-25. Hensel researched her story for months and neither she nor WISH-TV ever had any doubt as to the truthfulness of the News Report. Hensel Aff. at ¶¶ 13, 17-20, 31-38, 47. Thus, the WISH-TV defendants did not act recklessly with regard to whether the statements contained in the News Report were true.

The statements of the WISH-TV Defendants are exactly the type of commentary the Act means to protect. Given the evidence on the record, a reasonable jury could only find that the statements that formed the basis of CanaRx's claim were made pursuant to the WISH-TV Defendants' right of free speech in furtherance of public issue, that the statements were made in good faith and that they were lawful. No reasonable jury could find that Defendants acted with actual malice. CanaRx has not presented any evidence to convince this Court that there is a genuine issue of material fact in this case. Further, the WISH-TV Defendants are entitled to recover reasonable attorneys' fees and costs pursuant to section 34-7-7-7 of the Indiana Code because they are prevailed.

IV. **CONCLUSION**

For the foregoing reasons the defendants', LIN Television Corporation d/b/a WISH-TV and Karen Hensel, Motion to Dismiss pursuant to Indiana's Anti-SLAPP statute is **GRANTED.** Defendants shall file proof of their reasonable attorneys' fees within fifteen days of the date of this Order.  Plaintiff shall have ten days thereafter to file its objections thereto.  Once the Court has determined the reasonable attorneys' fees and costs to assess, judgment shall enter accordingly.

IT IS SO ORDERED this 29th day of May, 2008.

LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Electronically distributed to:

Joseph A. Morris
MORRIS & DE LA ROSA
mdlrusuk@aol.com

Geoffrey G. Slaughter
TAFT STETTINIUS & HOLLISTER LLP
gslaughter@taftlaw.com

Daniel P. Byron
BINGHAM MCHALE LLP
dbyron@binghammchale.com

Margaret M. Christensen
BINGHAM MCHALE LLP
mchristensen@binghammchale.com

Rafael A. Sanchez
BINGHAM MCHALE LLP
rsanchez@binghammchale.com

17